**STATE of Tennessee, Appellee,**

v.

**Richard T. JACUMIN, Appellant.**

Supreme Court of Tennessee,
at Nashville.

Oct. 9, 1989.

N. Reese Bagwell, Bagwell, Bagwell, Parker, Riggins and Kennedy, Clarksville, for appellant.

Tenn. Ass'n of Crim. Defense Lawyers, Amicus Committee, Paul J. Morrow, Jr., and Kenneth J. Ries Co–Chairpersons, Nashville, amicus curiae.

W.J. Michael Cody, Atty. Gen. & Reporter, Charles E. Bush, Asst. Atty. Gen., Nashville, for appellee.

## OPINION

COOPER, Justice.

The application for permission to appeal was granted to review the finding of the Court of Criminal Appeals that the affidavit, on which a search warrant was issued, "falls short of the constitutional requirement of probable cause to issue the warrant," even under the totality-of-the-circumstances rule of *Gates*,[1] and the Court's action in dismissing all charges against Richard T. Jacumin.

The record shows that a search warrant was issued at 11:35 p.m. on July 14, 1985, authorizing officers of the Metropolitan Police Department to search the dwelling at 3410 Tisdale Avenue, the brown mailbox in front of the residence, and a 1984 red Nissan automobile bearing Tennessee license number 14–15U1. The inventory of property seized in the search is dated July 15, 1985, with a time of 7:00 p.m. and shows the seizure of marijuana, white powder (which tested positively for cocaine), various items of drug paraphernalia and a Smith & Wesson, .38, with six bullets. The officers' return was signed July 15, 1985.

The defendant was indicted for possession of marijuana and cocaine with intent to manufacture, deliver or sell the drugs. He moved to suppress evidence seized by the officers. When the trial court denied the motion to suppress, the defendant entered guilty pleas, receiving a sentence of one year on the marijuana charge and seven years on the cocaine charge, with the sentences to be served consecutively. In entering the guilty pleas, the defendant, with the consent of the State and the trial court, reserved the right to appeal the following certified question of law dispositive of the case. *See* Rule 37(b)(2)(i), Tennessee Rules of Criminal Procedure.

Whether or not the search warrant and subsequent search conducted pursuant thereto violated the Defendant's constitutional rights under the Fourth Amendment to the Constitution of the United States and the Constitution of the State of Tennessee and its provisions relating to search and seizure.

As heretofore noted, the Court of Criminal Appeals concluded that the affidavit on which the search warrant was based was insufficient.

The primary issue in this appeal is whether the affidavit, on which the search warrant was issued, established probable cause that contraband was present on the premises of the defendant, or in his automobile or mailbox. The secondary issue is whether this Court, in determining probable cause, should adopt the totality of circumstances approach voiced by the Supreme Court of the United States in *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), or whether we should retain in some form the two-pronged test of *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964) and *Spinelli v. United States*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969), the test that *Gates* abandoned.

■ While *Gates* expressly abandons the *Aguilar–Spinelli* tests to be discussed below, much of the relevant law remains unchanged. The Fourth Amendment warrant requirement mandates a probable cause determination made by a neutral and detached magistrate. *Johnson v. United States*, 333 U.S. 10, 68 S.Ct. 367, 396, 92 L.Ed. 436 (1948). Where the determination is made by such a magistrate, it is entitled

1. *Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983).

to "great deference" by a reviewing court. The reviewing court's standard is whether the magistrate had a substantial basis for concluding that a search warrant would uncover evidence of wrongdoing. *Illinois v. Gates, supra,* 103 S.Ct. at 2331; *Spinelli v. United States, supra,* 89 S.Ct. at 591.

"[I]n passing on the validity of a warrant, the reviewing court may consider *only* the information brought to the magistrate's attention." *Aguilar, supra,* 84 S.Ct. at 1511, n. 1. In Tennessee, Rule 41(c), Tennessee Rules of Criminal Procedure, requires the information to be submitted by affidavit, though this is not required by federal constitutional law.

■ The affidavit showing probable cause may also be based on hearsay information and need not reflect the direct personal observations of the affiant. *Aguilar, supra,* 84 S.Ct. at 1514. In *Aguilar,* however, the Court stated that if the affiant relies on hearsay information from a confidential informant

> the magistrate must be informed of some of the underlying circumstances from which the informant concluded that the narcotics were where he claimed they were, *and* some of the underlying circumstances from which the officer concluded that the informant, whose identity need not be disclosed ... was "credible" or his information "reliable."

*Id.* [emphasis supplied] *Aguilar* thus has a "basis of knowledge" prong and a "veracity" prong. *Gates, supra,* 103 S.Ct. at 2347 (White, J., concurring).

In *Aguilar,* the supporting affidavit merely stated that the affiant had received information from a credible and reliable informant that contraband was on the premises to be searched. The Court pointed out that nothing in the affidavit showed the basis of the information, e.g., whether the informant had personal knowledge, or whether he merely suspected or believed that contraband was present 84 S.Ct. at 1513–14. And as the Court observed in *Spinelli,* the affiant did not attempt to support the claim that the informant was reliable or credible. *Id.* 89 S.Ct. at 587.

This two-pronged test was affirmed in *Spinelli.* There the Court appeared to recognize that the "basis of knowledge" prong could be satisfied absent an express statement if "the tip describes the accused's criminal activity in sufficient detail that the magistrate may know that he is relying on something more substantial than a casual rumor circulating in the underworld or an accusation based merely on an individual's general reputation." *Spinelli, supra,* 89 S.Ct. at 589. Neither the detail nor the independent police corroboration of the tip were sufficient in that case.

In *Gates,* the Court abandoned the two-pronged test of *Aguilar–Spinelli* in favor of a totality of circumstances approach. *Gates, supra,* 103 S.Ct. at 2328. The Court set forth several justifications for its action.

First,

> This totality-of-the-circumstances approach is far more consistent with our prior treatment of probable cause than is any rigid demand that specific "tests" be satisfied by every informant's tip. Perhaps the central teaching of our decisions bearing on the probable-cause standard is that it is a "practical, nontechnical conception." *Brinegar v. United States,* 338 U.S. 160, 176, 69 S.Ct. 1302, 1311, 93 L.Ed. 1879 (1949). "In dealing with probable cause, ... as the very name implies, we deal with probabilities. These are not technical; they are factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Id.,* at 175, 69 S.Ct., at 1310. Our observation in *United States v. Cortez,* 449 U.S. 411, 418, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981), regarding "particularized suspicion," is also applicable to the probable cause standard:
>
> > The process does not deal with hard certainties, but with probabilities. Long before the law of probabilities was articulated as such, practical people formulated certain common-sense conclusions about human behavior; jurors as factfinders are permitted to do the same—and so are law enforcement

officers. Finally, the evidence thus collected must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement.

*Id.,* at 2328.

Second, the Court regarded the approach as more in keeping with the deference given to the probable cause determinations of magistrates and the purpose of encouraging resort to the warrant procedure. *Id.* at 2331.

Third, the Court expressed the opinion that

"the two-pronged test" has encouraged an excessively technical dissection of informants' tips, with undue attention being focused on isolated issues that cannot be sensibly divorced from the other facts presented to the magistrate.

*Id.* at 2330. The Court went on to note that the language and the approach of *Aguilar* and *Spinelli* suggested that the two prongs were intended as guides and not as "inflexible, independent requirements in every case." 103 S.Ct. at 2328, n. 6. Yet a number of courts had struck down warrants supported by probable cause, based upon a rigid application of the *Aguilar–Spinelli* rules. *Id.* at 2330, n. 9, citing cases.

In *Gates,* the police received an anonymous letter stating that Lance and Sue Gates, a married couple living in the Chicago suburb of Bloomingdale, were engaged in drug dealing. The letter detailed their standard operating procedure. The buys took place in Florida. The wife would drive to Florida, leave the car to be loaded with drugs, then fly back. The husband would fly to Florida a few days later, and drive the car back. The letter received on May 3, 1978, stated that on May 3, the wife would be driving to Florida and that in a few days the husband would fly down to drive the car back with over $100,000 in drugs. The letter also said that the Gates presently had $100,000 in their basement, that big drug dealers visited them often and that they had bragged that they make their entire living on pushers. *Id.* at 2325.

The Court noted that standing alone, the letter did not establish probable cause. There was nothing from which a magistrate could conclude that the author was honest or the information reliable; there was nothing to indicate the basis for the writer's predictions as to future activity. 103 S.Ct. at 2326.

The police determined that a Lance Gates lived in Bloomingdale and that an L. Gates had booked a flight to West Palm Beach, Florida, on May 5. DEA agents placed the flight under surveillance. They saw Gates board in Chicago, arrive in West Palm, and take a taxi to a Holiday Inn where he went to a room registered to Susan Gates. The next morning, a DEA agent observed Gates and an unidentified woman leave in a Mercury bearing Illinois tags and headed north on the interstate frequently used by travelers to Chicago. The license tag on the Mercury had a number registered to a Hornet station wagon owned by Gates. The driving time between West Palm Beach and Bloomingdale was estimated by the agent as approximately 22–24 hours.

The Bloomingdale police detective submitted an affidavit containing the foregoing information. The magistrate issued the warrant determining that the modus operandi had been sufficiently corroborated. The Gates arrived at their home 36 hours after Lance Gates had flown out of Chicago. The police executed the search warrant upon their arrival.

In finding probable cause, the Supreme Court noted several factors. First, the flight to Florida, a well-known source of narcotics, followed by a brief overnight stay and an immediate drive back was at least suggestive of a prearranged drug run. *Id.* at 2334. Second, while the honesty and reliability of the informant were initially unknown, the corroboration of the letter's predictions sufficed in making the probable cause judgment. *Id.* at 2335. "It is enough, for purposes of assessing probable-cause, that '[c]orroboration through other sources of information reduced the chances of a reckless or prevaricating tale,' thus providing 'a substantial basis for cred-

iting the hearsay.'" *Id.* The third factor is quoted in full:

> Finally, the anonymous letter contained a range of details relating not just to easily obtained facts and conditions existing at the time of the tip, but to future actions of third parties ordinarily not easily predicted. The letterwriter's accurate information as to the travel plans of each of the Gateses was of a character likely obtained only from the Gateses themselves, or from someone familiar with their not entirely ordinary travel plans. If the informant had access to accurate information of this type a magistrate could properly conclude that it was not unlikely that he also had access to reliable information of the Gateses' alleged illegal activities. Of course, the Gateses' travel plans might have been learned from a talkative neighbor or travel agent; under the "two-pronged test" developed from *Spinelli,* the character of the details in the anonymous letter might well not permit a sufficiently clear inference regarding the letterwriter's "basis of knowledge." But, as discussed previously, *supra,* 2330, probable cause does not demand the certainty we associate with formal trials. It is enough that there was a fair probability that the writer of the anonymous letter had obtained his entire story either from the Gateses or someone they trusted. And corroboration of major portions of the letter's predictions provides just this probability. It is apparent, therefore, that the judge issuing the warrant had a "substantial basis for ... conclud[ing]" that, probable cause to search the Gateses' home and car existed.

*Id.* at 2335–36.

Because of the at least surface similarity of the *Gates* facts to the facts in the instant case, it is, we think, important to look more closely at the grounds for probable cause in *Gates.* The Court held that probable cause existed at the time the search warrant was issued, before the Gates arrived back in Bloomingdale in a drug-laden vehicle the next day. There is no suggestion that the search warrant was justifiable

on the doctrine of anticipatory searches. *See State v. Coker,* 746 S.W.2d 167, 172 (Tenn.1987) (approving anticipatory search on facts.) The significance of the evidence corroborating the anonymous letter was, as the Court notes at f.n. 14,

> that if the informant could predict with considerable accuracy the somewhat unusual travel plans of the Gates, he probably also had a reliable basis for his statements that the Gates' kept a large quantity of drugs in their home and frequently were visited by other drug traffickers there.

*Id.* at 2336.

The criticism of *Gates* should begin with Justice White's concurring opinion. While agreeing that *Aguilar–Spinelli* has been interpreted too rigidly, Justice White suggests that it should not be abandoned. Some showing of veracity and some showing of basis of knowledge is necessary. Clarification of the rule of corroborating information would be sufficient to avoid an unduly rigid application. On the *Gates* facts, for instance, he argues that the critical issue was not whether the activities of the defendants observed by police were innocent or suspicious. The critical factor is that this corroboration of the informer's story gave rise to an inference that the informant was credible and that he had obtained the information in a reliable manner. *Id.* at 2349. (Compare, e.g., *State v. Torres,* 146 Ariz. 202, 704 P.2d 1347 (App. 1985) (Corroboration under *Aguilar–Spinelli* must be of incriminating details not innocent activity.))

White, however, criticized certain statements in the majority opinion to the effect that, for instance, a deficiency in basis of knowledge could be remedied by an especially strong showing of veracity. As he notes, prior to *Aguilar–Spinelli,* the Court in *Nathanson v. United States,* 290 U.S. 41, 54 S.Ct. 11, 78 L.Ed. 159 (1933) held that no matter how reliable or unquestionably honest an informant might be, there must be some showing of supporting facts and circumstances on the basis of knowledge. As Justice White notes, it is not clear how far that majority wants to push

this statement, since it cites *Nathanson* with approval.

■ The Fourth Amendment to the U.S. Constitution provides that search warrants shall issue only "upon probable cause supported by Oath or affirmation." Article I, § 7, of the Tennessee Constitution provides in pertinent part

that general warrants, whereby an officer may be commanded to search suspected places, *without evidence of the fact committed,* or to seize any person or persons not named, whose offenses are not particularly described and supported by evidence, are dangerous to liberty and ought not to be granted. [emphasis added.]

Amicus focuses on the linguistic differences between the two provisions, particularly the phrase, "without evidence of the fact committed," in order to argue that Tennessee should retain the *Aguilar–Spinelli* rules abandoned by the U.S. Supreme Court in *Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983).

In *Sneed v. State,* 221 Tenn. 6, 423 S.W.2d 857, 860 (1968), this Court held that inasmuch as Art. 1, § 7 and the 4th Amendment are identical in intent and purpose, the state provision should not be construed more stringently than federal cases limiting the Fourth Amendment, regarding the latter "as particularly persuasive." In *State v. Lakin,* 588 S.W.2d 544 (Tenn. 1979), however this Court recognized that with regard to the "open field" doctrine, Tennessee case law has been somewhat more restrictive than federal cases. *Id.* at 549. While reaffirming the statement from *Sneed* quoted above, the Court stated:

Where, however, as in the particular phase of search and seizure law under consideration, there has been a settled development of state constitutional law which does not contravene the federal, we are not inclined to overrule earlier

decisions unless they are demonstrably erroneous.

*Id.,* footnote 2.

In *State v. Jennette,* 706 S.W.2d 614 (Tenn.1986), another case involving the "open field" doctrine, the majority opinion distinguished without overruling *Lakin,* noting that "it was recognized in that case that ordinarily the two constitutions should be construed alike where possible." *Id.* at 620.

Regarding the linguistic distinction between the state and federal constitutions at issue, it is perhaps significant that amicus does not point to a settled development of state constitutional law in the area of probable cause to support a search warrant analogous to the "open fields" doctrine. This, however, does not preclude this Court from refusing to adopt *Gates* for the reason that *Gates* is inadequate as a test of probable cause.

Although this Court has never expressly addressed the question,[2] several Court of Criminal Appeals cases have followed the *Gates* totality of circumstances standard on the basis of the language in *Sneed v. State. State v. Carpenter,* 773 S.W.2d 1 (Tenn. Crim.App.1989); *State v. Meadows,* 745 S.W.2d 886 (Tenn.Crim.App.1987); *State v. McAloon,* 708 S.W.2d 427 (Tenn.Crim.App. 1986); *State v. Hunt,* 665 S.W.2d 751 (Tenn.Crim.App.1984). The Court of Criminal Appeals in the instant case regarded itself as applying the *Gates* standard in holding the search warrant invalid.

As amicus points out, several state courts have rejected the *Gates* approach under state law. In *Commonwealth v. Upton,* 394 Mass. 363, 476 N.E.2d 548 (1985), the Massachusetts Supreme Court reversed on state constitutional grounds. The analogous state constitutional provision did not contain pronounced linguistic differences from the Fourth Amendment. Moreover, the Court rejected an argument that state statutes incorporated *Aguilar–Spinelli.* The Court, however, rejected *Gates* as unacceptably shapeless and

**2.** This Court in *State v. Bryan,* 769 S.W.2d 208 (Tenn.1989) quoted, with approval from *Illinois v. Gates* on the task of the issuing magistrates

and the duty of the reviewing court. The task and duty are the same under either the *Gates* standard or the *Aguilar–Spinelli* standard.

permissive, and concluded that *Aguilar–Spinelli,* if not applied hypertechnically, provided a more appropriate structure for probable cause inquiries under the state constitution, 476 N.E.2d at 556. Thus, while independent police corroboration could make up deficiencies in either prong, each prong represents an independently important consideration that "must be separately considered and satisfied or supplemented in some way." *Id.* at 557.

The Supreme Court of Washington also rejected application of the *Gates* standard under that State's constitution, characterizing it as "nebulous." *State v. Jackson,* 102 Wash.2d 432, 435, 688 P.2d 136, 139 (1984). Further, *see State v. Jones,* 706 P.2d 317 (Alaska 1985) and *People v. Johnson,* 66 N.Y.2d 398, 497 N.Y.S.2d 618, 488 N.E.2d 439 (1985) for decisions of similar import.

We agree with the Courts cited above that the principles developed under *Aguilar v. Texas, supra,* and *Spinelli v. United States, supra,* if not applied hypertechnically, provide a more appropriate structure for probable cause inquiries incident to the issuance of a search warrant than does *Gates.* We are also of the opinion that the *Aguilar–Spinelli* standard, or test, is more in keeping with the specific requirement of Article 1, Section 7 of the Tennessee Constitution that a search warrant not issue "without evidence of the fact committed." Consequently, we adopt the two-pronged standard voiced in *Aguilar* and *Spinelli* as the standard by which probable cause will be measured to see if the issuance of a search warrant is proper under Article 1, Section 7 of the Tennessee Constitution.

■ The search warrant in this case was issued on an affidavit[3] based on information provided a police officer by two confidential informants and by independent police work. The informants stated in pertinent part that defendant had been engaged in the drug trade in Montgomery County, and had moved to Davidson County to avoid interrogation in the death of Richard McCortle, and "was still involved in drug dealing," "that people came to [defendant's] home on Tisdale Drive on a regular basis to pick up cocaine and to pay for the cocaine that had been 'fronted' to them" and that the defendant "went to the Knoxville area on a regular basis to pick up his supply of cocaine from a person referred to as T.C." The basis for the informants' knowledge is not set out in the affidavit, nor is there any basis to establish the informants' credibility, unless later observations of police officers detailed in the affidavit are sufficient corroboration.

On receipt of the above information, the police officer checked with the local (Nashville) office of DEA, and learned that agents in that office were familiar "with a subject named Thomas Clay, also known to them as T.C., who lives in the Knoxville area possibly on Hackworth Drive," and that they had intelligence information that Thomas Clay was involved in cocaine smuggling. The officers then placed the defendant's residence "under surveillance for several weeks," with heavy surveillance for the 14 days preceding the filing of the affidavit. Several automobiles with Montgomery County license tags were observed at the Tisdale Avenue residence. Of these, one was registered to a reputed dealer in drugs, and it was *believed* a second automobile was driven by a person "suspected of being involved in drugs." A third vehicle was registered to a Hackworth Drive resident. However, there is nothing in the affidavit to show a connection between the vehicle, or its driver, and the elusive "T.C.", who is *believed* to reside in Knoxville on Hackworth Avenue.

While still having the Tisdale Avenue residence under surveillance, on July 11, 1985, the officer received information that the defendant would be gathering his money to go to Knoxville to pick up cocaine. This informant's reliability was established in that he had given drug-related information in the past which had proven to be accurate. However, the basis of the informant's knowledge is not set out in the affidavit. Three days later, on July 14, 1985, the defendant was seen leaving his residence, carrying a gym bag, and driving

---

**3.** The complete affidavit is set forth in the appendix to this opinion.

his automobile in the general direction of Knoxville on Interstate 40. The officers followed the defendant's automobile only to the Davidson County line.

In our opinion, the facts and circumstances set forth in the affidavit, when tested by the *Aguilar–Spinelli* standard, do not warrant a person of reasonable caution to believe that contraband was present in the Jacumin residence on Tisdale Avenue when the search warrant was issued. The initial information that Mr. Jacumin was a drug trafficer came from an unidentified, unverifiable informant. Further, there is nothing in the affidavit to indicate the source or basis of the informant's knowledge of Mr. Jacumin's activities. The long surveillance of the Tisdale home showed no unusual activity or regular visits by any person known by the surveilling officers to be in the drug business. It was reported to the officers that one automobile seen at the Tisdale residence was owned by a reputed drug dealer, but there is no indication that the owner was driving the automobile. The subsequent report that Mr. Jacumin was going to Knoxville in the future to buy drugs, while from an informant that had given good information in the past was short of specifics as to time, method of travel and the like, and gave no indication of the basis of the informant's knowledge. It is true the officers later observed the defendant driving on Interstate 40. However, they made no effort to verify that the defendant was going to Knoxville, but elected to stop surveillance at the Davidson County line. As was pointed out by the Court of Criminal Appeals, "in order to fairly conclude Jacumin would in the near future bring back cocaine (as stated in the affidavit), the magistrate would have to conclude, without any underlying basis therefor, that he would travel to Knoxville, and go to the location of or meet with T.C., the supposed supplier." We agree with the Court of Criminal Appeals that the Constitution of our state "would not sanction the use of such suppositions to subject a person and his home to a search."

Finding no probable cause for the issuance of a search warrant in this case, the judgment of the Court of Criminal Appeals suppressing evidence resulting from a search of defendant's premises and dismissing the charges against the defendant, is affirmed.

DROWOTA, C.J., and FONES, HARBISON and O'BRIEN, JJ., concur.

**438**

# APPENDIX

ORIGINAL COPY

(FILL OUT IN TRIPLICATE)

## CONTINUATIONS

(attach this sheet to search warrants)

DURING THE MONTH OF MAY 1985, YOUR AFFIANT RECEIVED INFORMATION FROM TWO CONFIDENTIAL RELIABLE INFORMANTS THAT THERE HAD BEEN A PERSON NAMED RICHARD MCCORTLE MURDERED IN MONTGOMERY COUNTY, TENNESSEE. ONE OF THE INFORMANTS STATED THAT THE MURDER WAS DRUG RELATED AND THAT RICHARD T. JACUMIN POSSIBLY WAS INVOLVED. THIS INFORMANT FURTHER RELATED TO AFFIANT THAT JACUMIN HAD LIVED IN CLARKSVILLE, TENNESSEE, BUT HAD "GONE ON THE RUN" AFTER RICHARD MCCORTLE DISAPPEARED. THIS INFORMANT ALSO STATED THAT RICHARD JACUMIN WAS LIVING ON TISDALE DRIVE IN DAVIDSON COUNTY WHEN MCCORTLE'S BODY WAS FOUND IN THE CUMBERLAND RIVER AND WAS STILL INVOLVED IN DEALING DRUGS, SPECIFICALLY COCAINE. THE RELIABLE INFORMANT STATED THAT SEVERAL PEOPLE FROM CLARKSVILLE CAME ON A REGULAR BASIS TO TISDALE DRIVE TO PICK UP COCAINE AND TO PAY FOR THE COCAINE THAT HAD BEEN "FRONTED" TO THEM. SAID INFORMANT STATED JACUMIN WENT TO THE KNOXVILLE AREA ON A REGULAR BASIS TO PICK UP HIS SUPPLY OF COCAINE FROM A PERSON REFERRED TO AS T.C. YOUR AFFIANT HAS CHECKED WITH THE LOCAL OFFICE OF THE FEDERAL DRUG ENFORCEMENT ADMINISTRATION AND HAS DETERMINED THAT AGENTS WITH THIS OFFICE ARE FAMILIAR WITH A SUBJECT NAMED THOMAS CLAY, ALSO KNOWN TO THEM AS T.C. WHO LIVES IN THE KNOXVILLE AREA POSSIBLY ON HACKWORTH DRIVE. THESE AGENTS FURTHER STATED THAT THEY HAD CERTAIN INTELLIGENCE INFORMATION INDICATING THAT THOMAS CLAY ALSO KNOWN AS T.C. IS INVOLVED IN COCAINE SMUGGLING. YOUR AFFIANT ALSO LEARNED FROM SGT. J. D. JONES, OF THE METROPOLITAN POLICE DEPARTMENT, INTELLIGENCE DIVISION, THAT CLARKSVILLE OFFICERS HAD CONTACTED HIM REQUESTING HELP IN LOCATING RICHARD JACUMIN'S HOUSE SO THEY COULD TALK TO HIM ABOUT THE MURDER OF RICHARD MCCORTLE. BECAUSE OF THE ABOVE INFORMATION, YOUR AFFIANT AND OTHER VICE OFFICERS HAVE HAD 3410 TISDALE DRIVE UNDER SURVEILLANCE FOR SEVERAL WEEKS. HEAVY SURVEILLANCE HAS BEEN DONE FOR THE PAST 14 DAYS. DURING THIS 14 DAYS, SEVERAL VEHICLES HAVE BEEN AT THE HOUSE WITH CLARKSVILLE ADDRESSESS ON THE TAG REGISTRATIONS. TWO OF THESE TAGS WERE TENNESSEE PLATES, 9DOR70, REGISTERD TO DAVID L. FISHER, AND 9D4D36, REGISTERED TO ROSETTA MAJORS, BELIEVED TO HAVE BEEN DRIVEN BY ERIC R. MAJORS. SGT. JIM BINKLEY, CONTACTED THE MONTGOMERY COUNTY SHERIFF'S OFFICE AND TALKED TO AN OFFICER BLACK WHO WORKS NARCOTICS. OFFICER BLACK TOLD SGT. BINKLEY THAT DAVID FISHER WAS A COCAINE DEALER IN THE CLARKSVILLE AREA, AND INDICATED ALSO THAT ERIC MAJORS WAS SUSPECTED OF BEING INVOLVED IN DRUGS. ALSO, DURING THIS TIME SPAN OF SURVEILLANCE, A VEHICLE WITH THE TAG OF 130P50, LISTED TO SUSAN DECARLO, OF 3309 HACKWORTH DRIVE, KNOXVILLE, TENNESSEE, WAS SEEN AT THE TISDALE HOUSE. HACKWORTH DRIVE IS THE SAME STREET THE DEA BELIEVES THOMAS CLAY LIVES ON. ON THE 11TH OF JULY, 1985, YOUR AFFIANT RECEIVED INFORMATION FROM A CONFIDENTIAL RELIABLE INFORMANT THAT RICHARD JACUMIN WAS

ORIGINAL COPY

(FILL OUT IN TRIPLICATE)

## CONTINUATIONS

(attach this sheet to search warrants)

GETTING HIS MONEY TOGETHER TO MAKE A TRIP TO KNOXVILLE TO PICK UP SOME COCAINE. THIS

INFORMANT HAS SUPPLIED YOUR AFFIANT WITH DRUG RELATED INFORMATION IN THE PAST WHICH

HAS BEEN TRUE AND CORRECT.

ON JULY 14TH, 1985, YOUR AFFIANT AND OTHER VICE OFFICERS, WATCHED AS RICHARD JACUMIN

CAME OUT OF 3410 TISDALE DRIVE CARRYING A "GYM BAG" AND ENTER A 1984 RED NISSAN,

BEARING TENNESSEE PLATE 14-1501. JACUMIN WAS FOLLOWED BY YOUR AFFIANT AND OTHER VICE

OFFICERS TO I-40 EAST AND FOLLOWED OUT OF DAVIDSON COUNTY HEADED TOWARDS KNOXVILLE.

BASED ON ALL OF THE ABOVE LISTED FACTS, YOUR AFFIANT BELIEVES RICHARD JACUMIN IS

GOING TO KNOXVILLE TO BRING BACK COCAINE IN THE 1984 RED NISSAN, BEARING TENNESSEE

PLATE, 14-1501 IN THE NEAR FUTURE. YOUR AFFIANT FURTHER BELIEVES THAT 3410 TISDALE

DRIVE CONTAINS DRUG RECORDS, PROCEEDS FROM DRUG SALES AND ASSORTED DRUG PARAPHERNALIA

USED WITH COCAINE AND THE DRUG COCAINE.

Your affaint therefore prays that a search warrant be issued upon the above facts, for the seizure of said items, or any part thereof, and that the same be brought before this Court as provided by law.

Witness my hand this _____7-14_____ ,19 85

_____(affiant)

Subscribed and sworn to before me this 7-14 _____ ,19 85 .

Judge of the Metropolitan General Sessions Court, Part__1_____.